**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2111
_____

ALBERT GARZA,
                              Appellant

v.

WARDEN ALLENWOOD USP
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. No. 3-15-cv-02482)
District Judge:  Honorable Matthew W. Brann
_____

Argued on May 26, 2022
_____

Before: KRAUSE and PHIPPS, *Circuit Judges*, and STEARNS,* *District Judge*.

(Opinion filed: October 14, 2022)
_____

Thomas S. Jones
David I. Kelch
Carrie R. Garrison   [**ARGUED**]
Porter Wright Morris & Arthur LLP
6 PPG Place
Third Floor
Pittsburgh, PA 15222

        *Counsel for Appellant*

---

* Honorable Richard G. Stearns, United States District Court for the District of Massachusetts, sitting by designation.

D. Brian Simpson    **[ARGUED]**
Office of United States Attorney
Middle District of Pennsylvania
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

　　　　　*Counsel for Appellee*

_____

OPINION[†]
_____

**PHIPPS**, *Circuit Judge*.

In appealing the denial of his § 2241 habeas petition, an inmate serving a federal life sentence claims that the United States Parole Commission unconstitutionally denied him parole in 2013 and 2015. He argues that a layer of administrative review for parole determinations, added to the federal parole regime in the 1970s, after he committed his initial offenses, violates the *Ex Post Facto* Clause. The inmate also contends that the decisions denying him parole violate the Due Process Clause because they relied on disciplinary sanctions expunged from his prison file.

Both of those claims fail. As applied to the inmate, the additional layer of administrative review is not an *ex post facto* law because it played no role in the denial of his parole, and regardless, it did not create a significant risk that he would be imprisoned for a longer period. Also, the parole determinations did not rely on expunged records. Thus, as elaborated below, in reviewing the District Court's legal conclusions *de novo* and its factual findings for clear error, *see Mickens-Thomas v. Vaughn*, 321 F.3d 374, 376 n.2 (3d Cir. 2003), the judgment of the District Court will be affirmed.

---

[†] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

BACKGROUND

The morning of May 1, 1973, Albert Garza approached the Border City Bank in El Paso, Texas, with the intent to rob it. As Garza entered, he shot the bank president, who was fleeing the scene and who later died from the gunshot wounds. While driving away from the bank, Garza was intercepted by police, who after a shootout, apprehended him. A federal grand jury indicted Garza on several counts, and he pled guilty to two of those. The District Court for the Western District of Texas sentenced Garza to life in prison for one count and a twenty-five-year consecutive sentence for the other. Garza later pursued collateral review, *see* 28 U.S.C. § 2255, and the Fifth Circuit upheld the life sentence but vacated the additional twenty-five-year sentence. *See Garza v. United States*, 498 F.2d 1066, 1068 (5th Cir. 1974).

At the time of Garza's 1973 offense, federal law permitted the possibility of parole for prisoners serving life sentences after fifteen years of incarceration. *See* 18 U.S.C. § 4202 (1970). By statute, the United States Parole Board had discretion to grant parole to eligible prisoners after finding that two conditions were satisfied: (i) to a "reasonable probability," the prisoner would not violate the law after release; and (ii) the release of the prisoner would not be "incompatible with the welfare of society." *Id.* § 4203(a). Before making a parole determination, the Board would receive a report and a recommendation from an "examiner designated by the Board." 28 C.F.R. § 2.15 (1973).

In 1976, Congress significantly revised the parole regime for federal inmates. *See* Parole Commission and Reorganization Act, Pub. L. No. 94-233, 90 Stat. 219 (1976) (originally codified at 18 U.S.C. §§ 4201–18 (1976)). Some of the changes were structural. Congress created a new administrative agency within the Department of Justice, the United States Parole Commission, to make parole determinations. *See* 18 U.S.C. § 4202 (1976). By regulation, the Commission established a parole review

3

system in which hearing examiners would make parole recommendations. *See* Paroling, Recommitting and Supervising Federal Prisoners, 42 Fed. Reg. 39,808, 39,815 (Aug. 5, 1977) (promulgating 28 C.F.R. § 2.23(b) (1977)). Under that system, two hearing examiners typically composed a parole review panel. *See* 28 C.F.R. § 2.23(b) (1977). If the panel members disagreed about a parole recommendation, then a third hearing examiner, known as the Regional Administrative Hearing Examiner, would cast the deciding vote. *See id.* But once two panel members agreed, either initially or with the involvement of a third hearing examiner, then without further action, that recommendation would become a determination by the Commission. *See id.* §§ 2.23(d), 2.24(a) (providing that a panel recommendation becomes a final determination unless the Regional Commissioner reviews it and refers the matter to the Commission). Also, the Commission could make parole determinations by exercising "original jurisdiction" over parole petitions at any point during the parole review process. *Id.* § 2.17; *see also* Paroling, Recommitting, and Supervising Federal Prisoners, 45 Fed. Reg. 33,604, 33,604 (May 20, 1980). Before 2021, as a matter of practice, the Commission exercised original jurisdiction over "high profile or complex cases." Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the United States and District of Columbia Codes, 86 Fed. Reg. 56,645, 56,645 (Oct. 12, 2021).

The 1976 legislation also modified the prior system of discretionary parole to create an additional, separate system of mandatory parole. *See* 18 U.S.C. § 4206(d) (1976). Under that system, the Commission would identify a presumptive mandatory release date for parole for a prisoner. *See id.* (setting the presumptive parole date as the date that a prisoner has served "two-thirds of each consecutive term" or "thirty years of

4

each consecutive term . . . including any life term"). But even with a presumptive mandatory release date, parole was not automatic; it was subject to a proviso:

> [T]he Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime.

*Id.*

In 1979, after these changes to the parole regime, Garza and another inmate escaped from the United States Penitentiary in Marion, Illinois. After a three-day search, law enforcement discovered them hiding in a nearby church basement. That prompted a shootout resulting in Garza's apprehension, as well as state and federal criminal charges and convictions. In Illinois state court, Garza was convicted for attempted murder and sentenced to twenty-five years' imprisonment, to run consecutively to his federal sentence. At the federal level, Garza pled guilty to escape, in violation of 18 U.S.C. § 751(a), and unlawful use of a deadly weapon, in violation of 18 U.S.C. §§ 111 and 2. The District Court for the Southern District of Illinois sentenced Garza to a fifteen-year sentence, to run consecutively to his initial federal sentence. By statute, Garza's additional fifteen-year federal sentence extended his presumptive mandatory parole date by ten years – from May 2, 2003, to May 2, 2013. *See* 18 U.S.C. § 4206(d) (1976).

Garza spent the next few months in the hospital, recovering from wounds he sustained during the shootout. During that time, the Marion Penitentiary Institution Discipline Committee held a disciplinary hearing in his absence. The Committee found that Garza had violated the penitentiary's internal rule against escape and imposed sanctions, including increased custody, disciplinary segregation, and a recommended re-assignment to the dangerous inmate unit.

5

Garza successfully challenged those prison sanctions through a habeas corpus petition in the Southern District of Illinois.[1]  A Magistrate Judge concluded that the Committee deprived Garza of due process by holding the hearing in his absence.  As a remedy, the Magistrate Judge ordered that all references to the Committee's disciplinary actions be removed from Garza's prison record.

Approximately twenty years later, in 1998, Garza had his first parole hearing.[2] The assigned hearing examiner recommended continuing the matter for a fifteen-year reconsideration hearing.  He also recommended that the Commission exercise original jurisdiction over Garza's case.  The Commission then heard the matter, denied parole, and scheduled Garza for a reconsideration hearing fifteen years later in February 2013.[3] The Commission later advanced Garza's fifteen-year reconsideration hearing one year, such that it occurred in February 2012.

By that time, the Commission had further refined the hearing process.  Under these reforms, a panel recommendation still required the concurrence of two hearing examiners, but the two hearing examiners no longer had to sit together as a two-person panel.  *See* Paroling, Recommitting, and Supervising Federal Prisoners: Parole Hearings Conducted by Single Hearing Examiners, 59 Fed. Reg. 45,624, 45,624 (Sept. 2, 1994). Also, the concurrence of two hearing examiners could no longer become a final decision due to Commission inaction; the Commission had to approve the recommended

---

[1] Garza also unsuccessfully pursued a § 1983 action based on the same events.  *See Garza v. Henderson*, 779 F.2d 390 (7th Cir. 1985).

[2] In the intervening period, Congress abolished the parole system for persons who committed federal crimes after November 1, 1987.  *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 235, 98 Stat. 1987, 2031 (1984).  Persons who committed federal crimes before then – such as Garza – remained eligible for parole.  *See id.*

[3] By statute, Garza could also seek parole approximately every two years, which he did unsuccessfully in 2000, 2002, 2004, 2006, and 2009.  *See* 18 U.S.C. § 4208(h)(2); 28 C.F.R. § 2.14(a)(1)(ii).

disposition for it to become final. *See* Paroling, Recommitting, and Supervising Federal Prisoners, 45 Fed. Reg. 84,052, 84,052 (Dec. 22, 1980). Relatedly, an Executive Hearing Examiner, who was a re-titled Regional Administrative Hearing Examiner, could also serve as one of the two hearing examiners needed for a panel concurrence. *See* Paroling, Recommitting, and Supervising Federal Prisoners: Hearing Examiner Review Function, 60 Fed. Reg. 51,348, 51,349 (Oct. 2, 1995) (re-titling and clarifying the role of Executive Hearing Examiner); 59 Fed. Reg. at 45,625 (permitting Executive Hearing Examiner to serve as one of the two hearing examiners).

At his fifteen-year reconsideration hearing, two hearing examiners disagreed about parole for Garza. One recommended Garza's release on parole later that year. The other, who held the title of Executive Reviewer, disagreed and recommended denial of parole. The Commission then exercised original jurisdiction and denied parole based on the seriousness of Garza's conviction for murder, his escape and attempted murder of a police officer, and his twenty-six other serious prison infractions.

Garza, who was incarcerated at United States Penitentiary Allenwood at the time, disputed that decision through a § 2241 habeas petition in the Middle District of Pennsylvania. He challenged several aspects of the denial of his parole: the extension of his mandatory parole date from 2003 to 2013, the lack of an in-person parole hearing, and the retroactive application of the new parole guidelines.

That petition was pending at the time of Garza's presumptive mandatory parole date and hearing in 2013. At that mandatory parole hearing, as with the fifteen-year reconsideration hearing, the hearing examiners were divided on the outcome – one recommended in favor of Garza's parole, the other (again, an Executive Reviewer)

recommended against it. The Commission again exercised original jurisdiction over the matter, and denied parole, again due to the seriousness of Garza's past misconduct:

> The Commission finds your acts of escaping from a secure institution, arming yourself with a firearm and firing shots at law enforcement officers when they attempted to detain you remain serious violations of the institution rules and the law even 34 years after their occurrence.

Commission Order Denying Parole (June 7, 2013) (App. 81).

Although Garza filed his habeas petition before that ruling, he submitted an addendum to challenge the denial of mandatory parole at his 2013 hearing. The District Court considered Garza's challenges, and then rejected each of them. *See Garza v. Holt*, 2013 WL 6731044, at *2–4 (M.D. Pa. Dec. 19, 2013). Yet in doing so, the District Court left open the possibility that Garza could bring *ex post facto* or due process challenges at hearings subsequent to his 2012 fifteen-year reconsideration hearing. *Id.* at *4 n.6, *5 n.7.

Garza sought parole again in 2015 as part of his statutorily mandated biennial parole hearings. *See* 18 U.S.C. § 4208(h)(2) (1976); 28 C.F.R. § 2.14(a)(1)(ii) (1979). Garza's case again divided the hearing examiners, with the Executive Reviewer voting against parole. The Commission exercised original jurisdiction over the matter and denied parole, again based on the seriousness of Garza's past misconduct:

> The Commission finds that you seriously violated the rules of the institution and the law during this period of confinement. Specifically, you escaped from a federal penitentiary, armed yourself with a firearm and shot at law enforcement officers when they attempted to detain you. The seriousness of this behavior is not diminished by the passage of time.

Commission Order Denying Parole (July 15, 2015) (App. 82).

## PROCEDURAL HISTORY

Garza initiated this case in the Middle District of Pennsylvania to dispute his denials of parole in 2013 and 2015. Some of the arguments that Garza raised had already

8

been addressed by the District Court's decision on Garza's prior habeas petition. The District Court rejected those repackaged claims as abuses of the writ, and Garza disputes that ruling on appeal. Garza also challenges the 2013 and 2015 parole denials on the grounds expressly left open by the District Court's prior decision – *ex post facto* and due process. The District Court considered these two claims and rejected them. *See Garza v. Oddo*, 2018 WL 2254786, at *2–4 (M.D. Pa. May 17, 2018); *Garza v. Oddo*, 2019 WL 1620058, at *1 (M.D. Pa. Apr. 16, 2019) (denying Garza's motion to amend the judgment). Now through a timely appeal, Garza invokes this Court's jurisdiction to dispute the District Court's application of the abuse of the writ doctrine, as well as its rejection of his *ex post facto* and due process claims. *See* 28 U.S.C. §§ 1291, 2253.

## DISCUSSION

At the outset, the parties disagree about whether the abuse of the writ doctrine bars any aspect of Garza's present petition. Abuse of the writ prevents a habeas petitioner from making a challenge in a subsequent habeas petition that he raised or could have raised in an earlier petition. *See Wise v. Fulcomer*, 958 F.2d 30, 34 (3d Cir. 1992) (citing *McClesky v. Zant*, 499 U.S. 467, 493 (1991)); *Benchoff v. Colleran*, 404 F.3d 812, 817 (3d Cir. 2005). Garza's initial habeas petition and supplemental addendum provided him an opportunity to challenge many aspects of both his fifteen-year reconsideration hearing in 2012 and his mandatory parole hearing in 2013, and he attacked those hearings on several grounds.

Due to the breadth of the arguments that Garza could have raised in that first petition, abuse of the writ bars several of the challenges in his second petition. That second petition argues that the Commission misapplied the mandatory parole statute. But Garza could have challenged the legal significance of the proviso in the mandatory parole

9

statute in his first petition, and he did so. Thus, abuse of the writ bars him from raising that same challenge in a subsequent petition, with respect to either his 2013 or his 2015 parole denial. Garza's second petition also contends that the passage of time mitigated any violation of institution rules that he committed in 1979. That argument could have been raised in the addendum to his first petition, but only with respect to the years between 1979 and 2013. Garza could not have argued about the effect of the additional passage of time between 2013 and 2015 in either his first petition or its addendum, which were filed in 2012 and 2013 respectively. Thus, abuse of the writ precludes his challenge to the denial of mandatory parole related to the passage of time between 1979 and 2013, but it does not preclude the portion of his challenge to the denial of mandatory parole related to the additional passage of time from 2013 to 2015. But even accounting for that incremental change, the Commission did not act unlawfully by reasoning that, even in 2015, the severity of Garza's violations of institution rules in 1979 – by attempting to escape and by shooting at a police officer – justified the denial of mandatory parole under the proviso. *See Furnari v. United States Parole Comm'n*, 531 F.3d 241, 254 (3d Cir. 2008) (explaining that the Commission need only articulate a "rational basis" for denying parole).

The government further contends that abuse of the writ bars Garza's two remaining claims: *ex post facto* and due process. Garza counters that the District Court expressly permitted him to raise these claims in a second petition, *see Garza*, 2013 WL 6731044, at *4 n.6, *5 n.7, thereby altering the ordinary application of abuse of the writ. Even if Garza is correct, those two claims fail on the merits, as explained below. *See Thompson v. Mo. Bd. of Prob. & Parole*, 39 F.3d 186, 190 n.3 (8th Cir. 1994) (declining to address abuse of the writ where the underlying claim for habeas relief lacked merit); *cf.*

*Lamb v. Estelle*, 667 F.2d 492, 496 (5th Cir. 1982) (declining to address a *res judicata* bar where the underlying claim for habeas relief lacked merit).

### A. The Challenged Reforms to the Parole System, As Applied Here, Do Not Offend the *Ex Post Facto* Clause.

Garza argues that, as applied to him, the post-1976 intermediate reviewer scheme is an unconstitutional *ex post facto* law. The prior, pre-1976 regime did not permit hearing examiners to decide parole; they could make only initial recommendations, and the Board decided parole. *See* 18 U.S.C. § 4203 (1970); 28 C.F.R. § 2.15 (1970). But as modified between 1976 and Garza's 2013 and 2015 hearings, a panel recommendation could become final without the Commission's express approval. *See* 28 C.F.R. § 2.23(d) (1977). Also, that interstitial review process would involve an additional step when the hearing examiners disagreed. In that circumstance, an executive reviewer would cast the tiebreaking vote. Garza contends that such intermediate decision-making by persons other than the Commission itself is an *ex post facto* law because it is retroactive and poses a significant risk of increased punishment. *See Holmes v. Christie*, 14 F.4th 250, 258 (3d Cir. 2021) (citing *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 508 (1995) (explaining that an *ex post facto* violation requires retroactive application of a law that produces a significant risk of increased punishment)); *Garner v. Jones*, 529 U.S. 244, 250 (2000) (same). That argument fails for three reasons.

First, Garza does not establish that an intervening change in law had any effect on the denial of his parole. He is incarcerated for two sets of offenses: his 1973 bank robbery and murder offenses, and his 1979 escape and unlawful use of a deadly weapon offenses. *See United States ex rel. Forman v. McCall*, 709 F.2d 852, 856 (3d Cir. 1983) ("[A]n ex post facto claim must focus upon the law in effect at the time of the *offense* for which a person is being punished."). Because the 1979 offense provides a basis for his

11

present incarceration, Garza must establish that a change to the parole regime after 1979 significantly increased his risk of increased punishment. *See* 18 U.S.C. § 4206(d) (1976); *Garner*, 529 U.S. at 247 (applying the parole regime in effect when the inmate committed his second offense: escape from prison); *United States v. Audinot*, 901 F.2d 1201, 1202 (3d Cir. 1990) (same).

Yet Garza does not claim that a change in policy between 1979 and 2013 or 2015 had such an effect. To the contrary, the revised regulations made the concurring recommendations of two hearing examiners less potent since they could no longer become final without any action by the Commission. *Compare* 28 C.F.R. §§ 2.23(d), 2.24(a) (1977) (allowing a panel recommendation to become final without the Commission's intervention), *with* 28 C.F.R. § 2.23(d) (2013) (providing that a hearing examiner panel recommendation becomes final only upon approval by the Regional Commissioner), *and* 28 C.F.R. § 2.23(d) (2015) (same).[4] Without showing how that change in policy influenced his parole determinations, Garza fails to establish that the change was an *ex post facto* law. *See Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 508 (1995) (explaining that the *Ex Post Facto* Clause does not protect against "minor" and "mechanical" changes to a parole regime); *Royster v. Fauver*, 775 F.2d 527, 529, 533 (3d Cir. 1985) (recognizing that no *ex post facto* violation occurs where the old and new standards are "essentially the same").

Second, even using the 1973 offense as the comparator, the extra layer of administrative review added post-1976 had no effect on the Commission's 2013 and 2015

---

[4] Additionally, at all times within that period, an executive reviewer could break a deadlock between divergent recommendations by hearing examiners. *Compare* 28 C.F.R. § 2.23(b) (1979) (providing that an executive reviewer can break a deadlock between hearing examiners), *with* 28 C.F.R. § 2.23(b) (2013) (same), *and* 28 C.F.R. § 2.23(b) (2015) (same).

denials of parole. Each time, the recommendations of the hearing examiners, including the Executive Reviewer, had no controlling force because the Commission exercised original jurisdiction over the parole determination. *See, e.g.*, *Bono v. Benov*, 197 F.3d 409, 412 n.5 (9th Cir. 1999) (discussing the difference between original jurisdiction and non-original jurisdiction cases). Although it was possible that two hearing examiners or an executive reviewer could have issued a final decision, that did not occur here. *See Richardson v. Pa. Bd. of Prob. & Parole*, 423 F.3d 282, 291 (3d Cir. 2005) (explaining that *ex post facto* claims receive as applied analysis). Thus, due to the Commission's exercise of original jurisdiction, the layer of review added post-1976 had no effect on the denial of Garza's parole, and it certainly did not significantly enhance the risk of his increased punishment.

Third, even in the absence of the Commission's exercise of original jurisdiction, an adverse decision at the intermediate-review stage would still not be an *ex post facto* violation. The legal standard for granting parole remained the same. *Cf. Mickens-Thomas*, 321 F.3d at 392 (recognizing that a change in the "substantive criteria for parole release" constitutes an *ex post facto* violation). The same types of information could be considered at a parole hearing. *Cf. Holmes*, 14 F.4th at 261 (explaining that an inmate plausibly alleged an *ex post facto* claim where the parole board enacted a new policy of considering "all-information" pertinent to parole). And the additional layer of review did not diminish any established rights held by an inmate. *Cf. Lynce v. Mathis*, 519 U.S. 433, 439 (1997) (explaining that retroactive cancellation of early release credits violated *Ex Post Facto* Clause). Thus, the additional administrative review did not significantly increase the risk that Garza would be denied parole. *See Holmes*, 14 F.4th at 258 (explaining that a "minor" change to a parole regime does not violate the *Ex Post Facto*

13

Clause); *Mickens-Thomas*, 321 F.3d at 392 (explaining that certain changes to the parole process can be "too minuscule to rise to a constitutional violation"); *Garner*, 529 U.S. at 259 (Scalia, J., concurring) (explaining that the *Ex Post Facto* Clause does not "freeze in time" a parole board such that it cannot undertake measures "that promote fairness and consistency").

### B. The Due Process Claim Rests on a Faulty Premise – The Commission Did Not Rely on Expunged Records to Deny Parole.

Garza also argues that the Commission's 2013 and 2015 parole denials relied on expunged prison records in violation of the Due Process Clause. But the factual predicate for that claim is missing. The Commission never indicated that it relied on such materials,[5] which were not the only sources of information about Garza's infractions in 1979 – those were also apparent from his federal and state-court conviction records. *See* 28 C.F.R. § 2.19(b) (2013) (allowing the Commission to consider additional information that "may be reasonably available"); 28 C.F.R. § 2.19(b) (2015) (same); *Dufur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1100 (D.C. Cir. 2022) (recognizing that the Commission may consider "available and relevant" information (internal citation omitted)). Without the Commission's reliance on expunged evidence, Garza's due process claim fails.

### CONCLUSION

For the foregoing reasons, the judgment of the District Court will be affirmed.

---

[5] At most, the hearing examiner *who recommended granting parole to Garza* referenced the Incident Report related to Garza's 1979 escape for the proposition that Garza violated prison rules by attempting escape. Even if that favorable recommendation could somehow prejudice Garza, it was not impermissible because only certain disciplinary actions, such as increased custody and disciplinary segregation, were expunged from Garza's record, and those did not include the Incident Report itself. *See Garza*, 779 F.2d at 391. Furthermore, Garza fails to explain why this alleged evidentiary error would warrant the extraordinary remedy of release. *See Marshall v. Lansing*, 839 F.2d 933, 943 (3d Cir. 1988) (holding that the district court appropriately remanded the matter back to the Commission for re-hearing when it violated its own regulations).